

**SIGNED this 19 day of January, 2011.**

_____
John C. Cook
**UNITED STATES BANKRUPTCY JUDGE**

_____


## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE


| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Senior Housing Alternatives, Inc.** | ) | **No. 10-15930** |
| | ) | **Chapter 11** |
| Debtor | ) | |


### M E M O R A N D U M

      This case is before the court on the motion of Bernard Global Investors, Ltd., to prohibit

the debtor's use of cash and for relief from the automatic stay. Also before the court is the mo-

tion of debtor Senior Housing Alternatives, Inc., to determine that the cash is free and clear of

Bernard's lien or, alternatively, for use of cash collateral if it is subject to Bernard's lien.[1]


---

    [1] The relief sought by the debtor's motion is based in part on the debtor's contention that
its debt to Bernard and the related loan and security documents are unenforceable under Sections
16-1-201 through 206 of the Tennessee Code Annotated and/or under the Tennessee common
law "unclean hands" doctrine. At the hearing on the motions, the debtor announced that it would
not pursue that contention at this time regarding the pending motions.

The principal issue for decision at this time is whether the postpetition income stream generated by the debtor's business constitutes "cash collateral" within the meaning of § 363 of the Bankruptcy Code. Bernard argues that the cash is not cash collateral because all rights to the income generated by the debtor's business were "absolutely" assigned prepetition to Bernard's predecessor in interest. The debtor argues that it retained some rights in the property even after the assignment and thus the cash is simply cash collateral that the debtor may use in this bankruptcy case so long as Bernard's interest is adequately protected. Having considered the briefs and arguments of counsel, together with the record in this case, the court concludes, for the reasons that follow, that the postpetition cash generated from the debtor's business does constitute cash collateral within the meaning of § 362.

## I.

The following facts appear to be undisputed. In June 2003, the debtor borrowed funds from Cornerstone Ministries Investments, Inc., signing a $5 million promissory note and a deed of trust with respect to property located at 825 Runyan Drive in Chattanooga, Tennessee. Also in connection with that loan transaction, the debtor signed an Absolute Assignment of Leases, Rents, and Profits in favor of Cornerstone. Section 1 of that instrument states that it assigned to Cornerstone "all the right, title and interest of [the debtor] in, to, and under all leases for the use and occupancy of the real property . . ., together with all the rents, royalties, issues, profits,  income, security deposits, and other benefits at any time occurring with respect to the leases." Section 2 of the assignment states its purpose:

> 2. <u>Payment of Debt and Obligations</u>.  The debt and the obligations (the "Debt" and the "Obligations") are defined in the Deed of Trust Security Agreement (the "Deed of Trust"), dated the same date as this Assignment, made by Owner in favor of the Trustee for the benefit of Lender. The Deed of Trust encumbers the

Property as security for the Debt and Obligations and is to be delivered and re-corded contemporaneously with the delivery of this Assignment. The purpose of Owner in making this assignment is [to] assign to Lender the right of Owner to collect and enjoy the Rents in partial payment of the outstanding Debt and Obli-gations of Owner to Lender as provided in this Assignment.

Section 3 of the assignment states in pertinent part:

3. <u>Present Assignment</u>. This Assignment is a present, absolute, and unconditional assignment to Lender [Cornerstone] of both the Rents and the Leases. This As-signment presently gives Lender the right to collect the Rents and to apply the Rents in partial payments of the Debt and Obligations . . . . Owner [the debtor] is represented by competent counsel and understands the legal effects of this As-signment. This Assignment is intended by Owner to create, and will be construed to create, an absolute assignment to Lender. This Assignment is not intended by Owner to be an assignment as security for the performance of the Debt or Obliga-tions . . . . Owner intends that the Rents absolutely assigned as provided in this Assignment are no longer, during the term of this Assignment, property of Owner or property of any estate of Owner as defined by 11 U.S.C. § 541 of the Bank-ruptcy Code and will not constitute collateral, cash or otherwise, of Owner. The term "Rents" as used in this Assignment will mean the gross capital rents without deduction or offset of any kind. This Assignment is intended by Owner to create, and will be construed to create, a present transfer of an interest or interests in real estate . . . . If despite this specifically expressed intention of Owner, any law exists requiring Lender to take actual possession of the Property (or some action equivalent to taking possession of the Property, such as securing the appointment of a receiver) in order for Lender to "perfect" or "activate" the rights and remedies of Lender as provided in this Assignment, Owner waives the benefits of such law and agrees that such law will be satisfied solely by:

(a) Lender giving Owner notice as provided in this Assignment that Lender intends to enforce, and is enforcing the rights and remedies of Lender in and to the Property and the Rents; and

(b) Lender giving notice to any or all Tenants on the Property that Tenants should begin making payments as provided in the Leases directly to Lender or the designee of Lender.

Section 5 of the assignment grants a revocable license to the debtor to collect and use the rents as

set forth below:

5. <u>License</u>. Lender grants to Owner a revocable license to collect, as agent of Lender and subject to this Assignment, the Rents, as the Rents become due,

and to enforce the Leases, so long as no default by Owner exists in payment or performance of the Debt or Obligations, the Deed of Trust, or this Assignment. The revocable license will automatically terminate without further action by Lender, except for notice to Owner, if a default occurs as provided in the Debt or Obligations, the Deed of Trust, or in this Assignment. Unless and until the license is revoked, Owner will apply the Rents (other than nonforfeited security deposits) to the payment of taxes, assessments, insurance premiums, utilities charges, and operation, repair, replacement and maintenance charges with respect to the Property which are due and payable at the time of collection of the Rents, before using the Rents for any other purpose.

Section 9.d. specifies the lender's rights upon the debtor's default:

> 9. <u>Lender's Rights</u>. Owner grants Lender the following rights:
>
> . . . .
>
> d. Upon any default by Owner as provided in the Debt or Obligations, the Deed of Trust, or in this Assignment, and without notice to or consent of Owner, Lender will have the following rights (none of which will be construed to be the obligations of Lender):
>
> . . . .
>
> (2) Lender may apply the Rents and any sums recovered by Lender as provided in this Assignment to the outstanding Debt, as well as to charges for taxes, insurance, improvements, repairs, replacement, maintenance, and other items with respect to the operation of the Property.

Finally, Section 11 of the Assignment makes clear that by paying the full amount of the debt owed to the lender, the debtor can reacquire the property assigned to the lender:

> 11. <u>Release</u>. Upon the payment to Lender of the full amount of the Debt and performance of the Obligations as evidenced by a recorded release of the Deed of Trust, this Assignment will be void and of no further effect.

In April 2005, the debtor signed a second, $1 million, promissory note, which was consolidated with the first note. The debtor ratified and affirmed the obligations under the first note and acknowledged that both notes, the deed of trust, and assignment constituted valid and enforceable obligations of the debtor.

In July 2006, the debtor signed a third note, in the amount of $214,001.10, in payment of outstanding interest on the first and second notes. The debtor ratified and affirmed the obligations under the first and second notes and acknowledged that all three notes, the deed of trust, and assignment constituted valid and enforceable obligations of the debtor.

In August 2006, Cornerstone assigned the notes, deed of trust, and assignment to CMI Asset Pool I, LLC, which granted a security interest therein to Bernard National Senior Funding, Ltd.

The debt was restructured again in February 2007, with the debtor again ratifying and affirming all its obligations under the three notes, the deed of trust, and assignment and acknowledging the validity and enforceability of the obligations. Later in 2007, Bernard National Senior Funding, Ltd., assigned its security interests in the notes, deed of trust, and assignment to Bernard Global Loan Investors, Ltd., and, in November 2008, Bernard foreclosed on CMI Asset Pool I, LLC, becoming the outright owner of the debtor's promissory notes, deed of trust, and assignment.

In February 2009, Bernard filed suit against the debtor in the United States District Court for the Northern District of Georgia to collect the debt. The debtor responded that Cornerstone had made improper charges to the loan account. Also in February 2009, Bernard notified the debtor that it had terminated the debtor's license to collect the rents from the property.

In December 2009, Bernard began foreclosure proceedings, but the debtor obtained a temporary injunction from the Chancery Court of Hamilton County, Tennessee, based on the allegedly improper charges to the account. On August 20, 2010, the Chancery Court dissolved the injunction and, on September 9, 2010, the debtor filed a motion for a stay pending appeal,

which the Chancery Court granted on the condition that the debtor post a bond in the amount of $1,275,000. The debtor filed a notice of appeal and a motion for the Tennessee Court of Appeals to reduce the bond, which was denied on October 5, 2010. The following day, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The debtor operates a senior living facility located on Runyan Drive, in Chattanooga, Tennessee. The income generated by the facility is the debtor's sole source of funds with which to operate the senior living facility.

On November 23, 2010, the court entered an Agreed Interim Order Regarding Use of Cash, which authorized the debtor to use its income to a certain extent, for certain purposes, and under certain conditions through January 18, 2011. A subsequent agreed order modified and extended the debtor's authorization to use its income to January 31, 2011.

## II.

As noted, the issue presently before the court is whether the income stream assigned pre-petition to Bernard's predecessor in interest now constitutes "cash collateral" within the meaning of § 363 of the Bankruptcy Code. The determination of this issue depends on whether the assignment at issue here was effective to transfer the rents[2] absolutely to the lender, thereby keeping the rents from becoming cash collateral in the debtor's bankruptcy estate.

---

[2] For simplicity, the remainder of this memorandum will use the term "rents" to refer to the property described in the rent assignment, although the debtor contends that some portion of the income stream represents compensation for services rendered, rather than rents, fees, charges, accounts, or other payments for the use or occupancy of rooms or other public facilities in the senior living facility.

The debtor seeks an order permitting the use of cash collateral pursuant to § 363(c)(2) of

the Bankruptcy Code which reads:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this
> subsection unless—
>
> > (A) each entity that has an interest in such cash collateral consents;
> > or
> >
> > (B) the court, after notice and a hearing, authorize such use, sale,
> > or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). In a chapter 11 case, a debtor in possession has the same rights as the

trustee under § 363. *See id.* § 1107(a). The term "cash collateral" is defined in § 363(a) of the

Bankruptcy Code, which reads in pertinent part:

> In this section, "cash collateral" means cash, negotiable instruments, . . . deposit
> accounts, or other cash equivalents whenever acquired in which the estate and an
> entity other than the estate have an interest and includes the proceeds, products,
> offspring, rents, or profits of property and the fees, charges, accounts or other
> payments for the use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as provided in
> section 552(b) of this title, whether existing before or after the commencement of
> a case under this title.

*Id.* § 363(a). Because the definition of "cash collateral" requires that both "the estate and an

entity other than the estate have an interest" in the cash collateral, property cannot be cash col-

lateral unless it is also property of the estate. *In re Kingsport Ventures, L.P.*, 251 B.R. 841, 845-

46 (Bankr. E.D. Tenn. 2000). Property of the estate is defined as "all legal or equitable interests

of the debtor in property as of the commencement of the case," "wherever located and by

whomever held." 11 U.S.C. § 541(a)(1). Therefore, the court must determine whether, at the

commencement of the debtor's bankruptcy case, the debtor had any "legal or equitable interests"

in the income stream generated by the debtor's business.

Absent a countervailing federal interest, the determination of what constitutes "property" turns on state law. *Butner v. United States*, 440 U.S. 48, 55 (1979) (applying state law to determine mortgagee's interest in rents). Bernard argues that, under Tennessee law, the debtor retained no property interest in the rents because the assignment that the debtor executed in connection with the loan transaction was an absolute assignment that transferred all of the debtor's interests in the rents to the lender, subject only to a license granted to the debtor to collect and use the rents, until the debtor's default, under the terms of its obligations to the lender. The debtor contends that, under Tennessee law, the so-called absolute assignment was in fact not absolute and that the debtor did retain some equitable interests in the rents that became property of the estate within the meaning of 11 U.S.C. § 541(a)(1).

An analytical framework for determining whether an assignment of rents is an absolute assignment or a pledge of security was set forth in the *Kingsport Ventures* case. There the court stated:

> To determine whether an assignment of rents is an absolute assignment or a pledge of security, a court must analyze the language and provisions of the assignment. Statements within the assignment that the assignment was intended to secure a debt [are] strong evidence that the assignments are in fact a pledge of security, even if the assignment is referred to as "absolute."
>
> The court is also guided by general principles of Tennessee contract law in its analysis of the Assignment. "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles." In doing so, the court "does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." The words used in the contract are "given their usual, natural and ordinary meaning." Finally, a contract must be enforced as it is written, even where its terms seem harsh or unjust, unless there is proof of fraud or mistake.

*Kingsport Ventures, L.P.*, 251 B.R. at 847 (citations omitted). The court agrees that one must examine the language used by the parties in a contract to ascertain the parties' intended agreement. In doing so, it is usually the case that the terms used in the agreement, when given their usual, natural, and ordinary meaning, evidence the parties' intent and reflect the true nature of the agreement. This is not always the case, however. Simply because the parties used particular terminology such as "absolute assignment" does not necessarily mean that an assignment was absolute. In such cases, the court must ascertain from the contract language the true essence of the parties' agreement, not what labels have been assigned to it. If it appears that the parties, through the provisions in a contract, created a security interest rather than an absolute assignment, the law will disregard the labels used by the parties and give effect to what the parties created. Thus, while the terms the parties use in their agreement, whether they be "absolute assignment" or "security interest," may actually end up describing the true nature of the transaction, those terms are not determinative, and the court must in the final analysis decide from examining the contractual language whether the assignment was in substance "absolute" or only created a security interest. In other words, the court looks at the terms of the contract and decides its true substance, not what it is labeled.

An example of this principle at work can be found in Tennessee mortgage law. While the Tennessee Supreme Court and the Tennessee Court of Appeals have not addressed the circumstances in which a rent assignment effects an absolute transfer of title, Tennessee courts have addressed the circumstances in which a purportedly absolute conveyance of land is treated as a security instrument. In *Harmon v. Faucette*, 8 Tenn. App. 137 (1928), *available at* 1928 WL 2092, Mr. Harmon was in default on a promissory note to Union Trust Company, secured by a deed of

trust on land. The bank advertised a foreclosure, but then the bank agreed to accept a deed in lieu

of foreclosure. Rather than record the deed, the bank agreed to reconvey the property to the Har-

mons if he satisfied his debt by a certain date. Mr. Harmon did not pay the debt and the bank

sold the property. The Harmons then sued the bank for the difference between the recited pur-

chase price at the time the property was conveyed to the bank and the balance of the promissory

note, contending that the conveyance was an "outright conveyance." The court rejected that con-

tention:

> We do not think the appellant establishes the fact that the deed was an out-
> right conveyance to the bank in consideration of $3500. The officers of the bank
> had not seen the property and the bank was not purchasing real estate; it was only
> attempting to secure its loan.
>
> . . . .
>
> The criterion whether a deed absolute on its face is in fact a mortgage is
> placed upon the question of whether the debt is discharged. The proof in this case
> shows that upon the day of the sale the cash payment was credited upon Mr. Har-
> mon's note, and later in the month the note was cancelled and marked paid and
> returned to Mr. Harmon. This act, together with the admissions that the deed was
> subject to be returned to Mr. Harmon on the payment of the debt up until Septem-
> ber 1st constitutes it, without doubt, a mortgage up until September 1st, and the
> rule of law is once a mortgage, always a mortgage.
>
> "In the equitable view, a mortgage may be described in general terms as
> an assurance or pledge of or charge upon property, real or personal, for an ante-
> cedent, present or future debt or loan, as security for and redeemable upon the
> payment of such debt. The fundamental principle of equity is, that whenever a
> conveyance of land is given for the purpose of securing payment on an existing
> debt, it is a mortgage. If the fact is established that a debt exists between the par-
> ties and the transaction did not amount to a present payment, satisfaction, or dis-
> charge of that debt, to recognize it as still continuing, to be paid at some future
> time, and was intended to be a security for such payment, then the instrument is
> always regarded in equity as a mortgage, whatever be its form.
>
> In general, all persons able to contract are permitted to determine and con-
> trol their own legal relations by any agreement which will not be illegal or op-
> posed to good morals or public policy; but a mortgage forms a marked exception

to this principle. The doctrine has been firmly established from an appeal had that when the character of the mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue; if the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express or positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption after default is preserved remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction, purported to cut off this right."

The [theory] on which equity bases this doctrine is that it abhors [penalties] and [forfeitures]. To permit the bank in this instance to [forfeit] upon failure of the debtor to redeem is in equity a penalty.

*Id.*, 1928 WL 2092, at *2-*4 (citation omitted) (holding that, since the conveyance was treated as a mortgage, the bank's sale of the property was a foreclosure and it was obligated to advertise the sale and remit any surplus to the Harmons); *accord*, *Blizzard v. Craigmiles*, 75 Tenn. 693 (1881), *available at* 1881 WL 4401, at *3 (holding absolute deed to operate as mortgage, because it was not given for present consideration and because property was to be reconveyed upon payment of debt); *Williams v. Burmeister*, 338 S.W.2d 645, 652 (Tenn. Ct. App. 1959) (treating general warranty deed, given in exchange for loan, as mortgage).

Likewise, in *Sellers v. Sellers*, 53 S.W. 316 (Tenn. Ct. Ch. App. 1899), at the time the transferor was indebted to the transferee, the transferor conveyed land to the transferee "by a deed absolute on its face." Also, the transferee, reciting that he had bought the land, authorized the transferor to mine coal on the land and also agreed to reconvey the land to the transferor if the debt was paid within a certain time. The court construed the deed as a mortgage:

-11-

In *Hinson v. Partee*, 11 Humph. 587, the court said that, when a condition-al sale is established, the court is inclined to construe it a mortgage, because in so doing justice is done to all parties; but when the conveyance is in consideration of a pre-existing debt, and such condition exists, it is difficult to find a case that has not been held to be a mortgage. In *Ehert v. Chapman*, 8 Baxt. 27, 29, it is said that it is the settled rule in all cases in which a pre-existing debt, or a loan made at the time of the purchase, was the consideration of the deed of conveyance, the debt is considered as the thing contracted for, and the estate as collateral thereto; that this rule, however, is only applicable to cases where the estate was really intended as a security for the payment of money, and not to those where there was no precedent debt and no loan of money, but an honest design to purchase the property with the condition of repurchase; and also, if the real intention of the parties can be gath-ered from the face of the papers, that intention will determine the true character of the deed. Now, if we look to the face of the papers alone in connection with the point agreed upon in the pleadings, namely, that the consideration for the instru-ment was a pre-existing debt, it is clear that the purpose was to create a mortgage to secure the debt. This is apparent, not only from the provision allowing the com-plainant to mine coal upon the land, but also from the last clause of the defea-sance, providing that the complainant should have the land back if within two years he should repay to E. T. Sellers "the said amount of $676.83, with its ac-crued interest." If to this we add the testimony already mentioned, the conclusion is placed beyond any sort of doubt. On both grounds we are of the opinion that the decree of the chancellor to the effect that the transaction should be construed a mortgage was correct.

*Id.* at 317-18 (citation omitted). Thus, under Tennessee law, a deed that is absolute on its face and is given in connection with a loan to the transferor will nevertheless be treated as a mortgage if it is not given in exchange for a present consideration and the property is to be reconveyed on satisfaction of the debt.

In sum, courts have examined the essence of the contracts in concluding that the trans-actions were mortgages, not absolute conveyances, and the court sees no reason not to apply these same principles to the assignment of rents executed concurrently with the note and deed of trust in this case. *See Bryn Athyn Investors, Ltd. v. Hutton/Conam Realty Pension Investors (In re Bryn Athyn Investors, Ltd.)*, 69 B.R. 452, 456-58 (Bankr. E.D. N. C. 1987) (relying on North Carolina law regarding treatment of purportedly absolute deeds as mortgages, similar to Tennes-

-12-

see law, in holding that rent assignment created security interest). Here, the purpose of the as-
signment is to secure repayment of the debt: Section 2 of the rent assignment instrument makes
clear that "[t]he purpose of Owner in making this assignment is [to] assign to Lender the right of
Owner to collect and enjoy the Rents in partial payment of the outstanding Debt and Obligations
of Owner to Lender as provided in this Assignment." The assignment was given in exchange for
the loan, not a present consideration. Moreover, Section 11 of the instrument provides that,
"[u]pon the payment to Lender of the full amount of the Debt and performance of the Obliga-
tions as evidenced by a recorded release of the Deed of Trust, this Assignment will be void and
of no further effect." Despite other provisions in the assignment that might suggest an absolute
assignment had occurred, the court is of the opinion that the aforementioned provisions of the
assignment show that, at its essence, the assignment had the effect of creating a security interest.
Based on the aforementioned Tennessee cases and legal principles, the court believes that, under
state law, an assignment of rents absolute on its face will nevertheless be viewed as a security in-
terest if given in connection with a mortgage loan and not in exchange for a present considera-
tion[3] and if the rents are to be reconveyed upon satisfaction of the debt.[4]

---

[3] *See* Julia Patterson Forrester, *A Uniform and More Rational Approach to Rents as Se-
curity for the Mortgage Loan*, 46 Rutgers L. Rev. 349, 380 (1993) ("If the lender were truly pur-
chasing the rents, then the lender would give some consideration for the purchase, such as a re-
duction in the debt by an amount equal to the present value of the future rental stream.")

[4] Tennessee statutory law does not conflict with this conclusion. In fact, § 66-26-116 of
the Tennessee Code Annotated appears to treat rent assignments like secured transactions, as it
speaks of "perfection" of the instrument whether it purports to "grant," "transfer," "pledge," or
"assign" the lessor's interest in leases or rents arising from real property, and it requires the re-
lease of any registered instrument granting, transferring, pledging or assigning any interest in
leases or rents arising from real property upon satisfaction of the debt.

Bankruptcy Judge George Emerson of the Western District of Tennessee reached a similar conclusion less than six months ago in *In re Village Green I, GP*, 435 B.R. 525, 531 (Bankr. W.D. Tenn. 2010). There, the lender argued that, "because the rents were subject to a pre-petition absolute assignment, they were not property of the estate." *Id.* The court held otherwise, relying largely on the language providing for the release of the instrument setting forth the rent assignment upon satisfaction of the debt:

> Like the contract in the *[In re] 5877 Poplar, L.P.*[, 268 B.R. 140 (Bankr. W.D. Tenn. 2001)] case, the Debtor here retained some interest in the rents. The Debtor retained an interest in the surplus funds generated after payment of monthly obligations, as well as after the Note is paid in full. "Upon payment of the Indebtedness, Lender shall release this Instrument."
>
> . . . .
>
> In the analysis of the assignment language, "statements within the assignment that the assignment was intended to secure a debt is strong evidence that the assignments are in fact a pledge of security", even if the assignment is referred to as "absolute." In conducting its analysis, the Court must look to the reality of this particular transaction's structure, regardless of the "absolute" label that has been placed upon it.
>
> Historically, there is support for giving effect to the realities of the underlying transaction despite the form placed on it by the parties. Prior to the codification of Tennessee's current version of the Uniform Commercial Code, there was much confusion created by agreements which were secured sales "disguised" as leases. In analyzing these agreements, courts looked to the substance of the transaction between the parties, regardless of the form. "The agreement creating a security interest can be in any form-sale, consignment, lease, bailment or whatever the parties can imagine. The agreement need not say that it is granting a security interest. The practical effect of the agreement determines whether it was intended to create a security interest."
>
> Hon. Ronald Lee Gilman, writing for the Sixth Circuit Court of Appeals, when determining whether separation agreement payments were alimony or really a "disguised property settlement" aptly stated, "There is a saying that if something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck." In Tennessee, the similar principle is stated as "[e]quity looks to substance and not to form."

-14-

Similarly, there is a longstanding Tennessee legal principle that even if a deed is labeled "absolute" on its face, if the actual circumstances dictate, the court will regard it as a mortgage. "If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express or positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity." [citing *Harmon v. Faucette*] Other bankruptcy courts have implemented similar state law principles in the assignment of rents analysis.

In *In re Willows of Coventry, Ltd.*, 154 B.R. 959, 963 (Bankr. N.D. Ind. 1993), the bankruptcy court applied the general principle that "if a conveyance is made as a security for money, in whatever form the conveyance is made, or whatever cover may be used to disguise the transaction and hide its real character from others . . . it will be held and treated as a mortgage." The court went on to find that the assignment of rents at issue was nothing more than a security device. "There is absolutely no reason this court can identify which would indicate that the Indiana courts would not apply these same fundamental principles to an assignment of rents, in connection with determining whether such an agreement constitutes an absolute conveyance or a lien." *Id.* at 964.

The instrument in that case, like the Deed of Trust here, stated on its face that it was made for the purpose of securing a contemporaneously executed note. Likewise, upon full payment of the note, the assignment would become void, similar to the release provision in both the Deed of Trust before this Court and the instrument in the *5877 Poplar* case, wherein the court commented, "Apparently, the Debtor did not assign its rights to the rents and revenues ad infinitum and retained some interest in the rents."

Likewise, the court in *In re Buttermilk Towne Center, LLC*, 428 B.R. 700, 706 (Bankr. E.D. Ky.2010) found that Kentucky state law, like Indiana law, supported a finding of substance over form. In Kentucky, even if a document states on its face that it is a deed of conveyance, courts will hold that it is a mortgage if it is a security for money. *Id.* at 706 (citation omitted). The instrument in the *Buttermilk Towne Center* case, like the Deed of Trust under analysis here, also contained language that it served to secure payment on indebtedness and was of limited duration, becoming null and void upon payment of all outstanding amounts. *Id.* The Deed of Trust under consideration here has similar features to the assignments in the both the *Willows of Coventry* and *Buttermilk Towne Center* cases. The substance of the transaction as a whole, significant provisions of the Deed of Trust, and Tennessee case law support a finding that the assignment of rents in question is not an absolute assignment but in reality an assignment meant to secure the underlying obligation to Fannie Mae.

*Id.* at 536-38 (additional citations omitted); *see In re 5877 Poplar, L.P.*, 268 B.R. 140, 149

(Bankr. W.D. Tenn. 2001) (Kennedy, J.) (noting significance of provision requiring release of

security instrument upon satisfaction of debt, concluding that "the Debtor did not assign its

rights to the rents and revenues *ad infinitum* and retained some interest in the rents."); *see also In*

*re Buttermilk Towne Ctr., LLC*, Nos. 10-8036, 10-8046, 10-8062, 2010 WL 5185870, at *4-*5

(B.A.P. 6th Cir. Dec. 23, 2010) (holding that Kentucky assignment of rents had effect of granting

security interest, based in part on termination of assignment upon satisfaction of debt); *In re*

*Amaravathi Ltd. P'ship*, 416 B.R. 618, 633-37 (Bankr. S.D. Tex. 2009) (if effect of transaction is

that borrower retains an interest in rents, then transfer is not truly "absolute."); *Lyons v. Federal*

*Sav. Bank (In re Lyons)*, 193 B.R. 637, 648 (Bankr. D. Mass. 1996) ("The fact that the assign-

ments are conditioned upon default and will terminate upon satisfaction of the debt indicates that

they are merely additional security for the loan, and not an absolute transfer of the Debtors'

interest in the rents to the Bank."); *In re May*, 169 B.R. 462, 470-71 (Bankr. S.D. Ga. 1994)

("[A]n assignment, which is characterized as 'absolute', is not absolute in the sense that it totally

divests a grantor of any and all interest in the rents. The grantor retains an equitable interest in

the rents, and whether the interest is depicted as a 'reversionary interest', a 'right of redemption'

or the like, it is an interest which becomes property of the bankruptcy estate. . . . [I]t is . . .

sufficient to give the bankruptcy estate an interest in the rents and allow a debtor-in-possession

to use such rents in the operation of its business."); *cf.* Julia Patterson Forrester, *Still Crazy After*

*All These Years: The Absolute Assignment of Rents in Mortgage Loan Transactions*, 59 Fla. L.

Rev. 487, 513-14 (2007)[5]; John J. Rapisardi & Elliot L. Hurwitz, *The Mortgagee's Right to Rents after Default: An Unsettled Controversy*, 6 J. Bankr. L. & Prac. 331, 357 (1997) ("If the equity of redemption is a contingent right that is a part of the debtor's estate in lien and title theory states, then for bankruptcy purposes, courts should consider whether there truly is any practical difference under either lien or title theory. That is, upon commencement of a bankruptcy case under either theory, rent should remain property of the estate and subject to use as cash collateral with either the lender's consent or court authorization.").

Characterizing the assignment as creating a security interest rather than an absolute conveyance of all rights in the rents simply recognizes an obvious and unremarkable fact. Under Tennessee law, the debtor retained at least one lingering interest in the rents: upon payment of the underlying note, the assignment would be nullified, and the rents would return to the debtor.

---

[5] The author of this law review article contends:

> The courts holding that an absolute assignment does in fact create a type of security interest are correct because of the true substance of the assignment of rents in the context of a mortgage loan. The substance of the transaction is the creation of a security interest for a number of reasons. First, an absolute assignment of rents is given in connection with (and only because of) the related mortgage loan. Second, the borrower is typically permitted to collect rents prior to default. Although the borrower may be required to apply rents to pay for operation and maintenance of the property and to pay debt service, the borrower's use of excess rents is not restricted. Third, the lender is not entitled to collect rents until after a default under the terms of the mortgage loan. Fourth, the rents that the lender collects must be applied to the indebtedness or for expenses related to the mortgaged property. The lender cannot use rents to give its stockholders a dividend, to give its employees a raise, or to redecorate its offices. Fifth, the borrower retains the risk of nonpayment of rents by the tenants. If a tenant fails to pay rent, the debt is not reduced. Finally, the absolute assignment of rents terminates upon payment in full of the debt. After the debt is paid, the "lien" on rents must be released, and the borrower may collect them unencumbered by any obligation to the lender. All of these factors point to the fact that the absolute assignment is in fact a security interest.

Under the release provision, had the debtor tendered payment on the note, Bernard would have had an obligation to reconvey the right to the future rents. There is no suggestion that a Tennessee court would not enforce this obligation against Bernard. Therefore, on the petition date, the debtor possessed, at the very least, an equitable interest in the future rents under Tennessee law and this equitable interest constitutes property of the estate.[6]

Having concluded that the debtor had at least one equitable interest in the postpetition rents at the commencement of the bankruptcy case, the court must next consider the impact of §542(a) of the Bankruptcy Code and *United States v. Whiting Pools*, 462 U.S. 198 (1983), as it relates to those rents. Section 542(a) of the Bankruptcy Code provides in relevant part:

> Except as provided in subsection (c) or (d) of this section, an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). In *Whiting Pools*, the Supreme Court specifically addressed the scope of § 542(a) and "in essence held that so long as the debtor retained some legal or equitable interest in property, its right to turnover under § 542 extended to all interests in that property." *Bryn*

---

[6] In contending that the parties did not intend for the debtor to have any interests in the rents if it filed a bankruptcy petition, Bernard also relies on a provision in the assignment that declares that "Owner intends that the Rents absolutely assigned as provided in this Assignment are no longer, during the term of this Assignment, property of Owner or *property of any estate of Owner as defined by 11 U.S.C. § 541 of the Bankruptcy Code and will not constitute collateral, cash or otherwise, of Owner*." (Absolute Assignment of Leases, Rents, and Profits § 3 (emphasis added).) The fact that the debtor still has a recognized property interest in the future rents upon commencement of a bankruptcy case is not something that can be ignored and excluded from property of the estate simply because the parties attempted to narrow the meaning of property of the estate in the assignment. After all, property of the estate is defined by the Bankruptcy Code, and all of the debtor's creditors, as well as the debtor, are given the benefit of all property of the estate, whatever that property might be.

-18-

*Athyn Investors, Ltd.*, 69 B.R. at 454-55; *accord*, *In re Bethesda Air Rights Ltd. P'ship*, 117 B.R. 202, 210 (Bankr. D. Md. 1990). Thus, if the debtor retains any interest in property as of the commencement of the case, it is entitled to the possession and use of the property during the case subject to the requirement of adequate protection set forth in 11 U.S.C. § 363(e). *Whiting Pools*, 462 U.S. at 203-04; *Bryn Athyn Investors*, 69 B.R. at 456-58 (applying *Whiting Pools* to rent assignment).

Outside of bankruptcy, Bernard, having taken all action required by the assignment document, would be entitled to obtain or retain possession of the rents. The result is different in bankruptcy, because the Code recognizes the need of the debtor in possession to use property of the estate for the benefit of all creditors, while at the same time protecting the creditor's interest. As the Supreme Court explained:

> In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future. Until the business can be reorganized pursuant to a plan . . ., the trustee or debtor-in-possession is authorized to manage the property of the estate and to continue the operation of the business. By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap." The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate. Thus, to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate.
>
> This authorization extends even to property of the estate in which a creditor has a secured interest. Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests. At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. The creditor with a secured interest in property included in

the estate must look to this provision for protection, rather than to the nonbank-
ruptcy remedy of possession.

. . . .

As does all bankruptcy law, § 542(a) modifies the procedural rights avail-
able to creditors to protect and satisfy their liens. In effect, § 542(a) grants to the
estate a possessory interest in certain property of the debtor that was not held by
the debtor at the commencement of reorganization proceedings.

*Whiting Pools*, 462 U.S. at 203-04, 206-07. As one bankruptcy court, applying the principles of

*Whiting Pools* to a rent assignment, explained:

In justifying application of these principles to IRS, the Court in *Whiting
Pools*, noted that at no point did the interest of the IRS in the property exceed the
value of the lien and that the IRS was obligated to return to the debtor any surplus
from sale. The same result pertains here by the terms of the Assignment. Al-
though in *Whiting Pools* the Court further noted that ownership in the seized
property would not be transferred until the tax sale, even if Lender in the instant
case was found to have perfected legal title to the rents, at no point did Lender's
interest exceed the debt, and Lender was obligated to return the surplus rents after
repayment. The substantive effect is the same. Debtor must have the rents to
operate and to exercise the opportunity provided by Chapter 11 of the Bankruptcy
Code to reorganize, and Lender is entitled to adequate protection for use of the
rents for these purposes. If adequate protection is provided, the Bankruptcy Code
imposes delay on the exercise of state law rights in order to facilitate the goal of
reorganization. Any other result would mean there is nothing to reorganize.

*Bethesda Air Rights Ltd. P'ship*, 117 B.R. at 210. The same may be said in this case.


**III.**

In sum, because the debtor at the commencement of this bankruptcy case held an equi-

table interest in the future income stream generated by the debtor's business, that interest is

property of the debtor's bankruptcy estate and the postpetition income constitutes cash collateral

within the meaning of § 363(a) of the Bankruptcy Code.[7]  The court will enter a separate order

that (1) determines that the income stream assigned to Bernard's predecessor in interest con-

stitutes "cash collateral," (2) denies Bernard's request to prohibit the debtor from using the in-

come stream due to Bernard's ownership thereof; and (3) denies without prejudice Bernard's

request for relief from the automatic stay on the ground that the debtor may not use any of the

rents. The court will leave to the parties' agreement or further proceedings the issue of whether

the debtor can provide adequate protection of Bernard's interest in the income stream such that

the debtor may use the cash collateral.

# # #

---

[7] The court is aware that its conclusion differs from that reached in *In re Kingsport Ventures, L.P.,* 251 B.R. 841 (Bankr. E.D. Tenn. 2000), and more recently in *In re Lingham Rawlings, LLC*, No. 10-32769, 2010 WL 3490204 (Bankr. E.D. Tenn. Sept. 1, 2010), which dealt with assignments very similar to the one in this case. There the court held that an assignment is absolute where (1) the language of the assignment is clear and unambiguous that it was intended to be an absolute assignment, (2) the assignment provides that the debtor retains nothing more than a revocable license to operate the property and collect the rents, (3) the assignment does not require the assignee to take any action in order to collect the rents after default, and (4) the assignment gives the assignee total discretion regarding the application of rents collected by it after default to reduce the debtor's outstanding obligation. However, neither *Kingsport Ventures* nor *Lingham Rawlings* addressed either the debtor's right to obtain a reconveyance of the rents upon payment of the debt or *Whiting Pools*. Having identified the existence of an equitable interest in the future income stream under state law, the court feels bound by the dictates of *Whiting Pools,* § 541(a), and § 363(a) to recognize the postpetition rents as cash collateral.

-21-